ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| JOSÉ JOSUÉ VELILLA SOTOMAYOR<br><br>Apelado<br><br>v.<br><br>RACHAEL MALDONADO VICENTE<br><br>Apelante | KLAN202301005 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Civil núm.: SJ2022RF00928<br><br>Sobre: Custodia y Relaciones Filiales |

Panel integrado por su presidenta la juez Domínguez Irizarry, el juez Pérez Ocasio y el juez Campos Pérez[1]

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 28 de enero de 2025.

Comparece ante nos la parte demandada y apelante, Sra. Rachael Maldonado Vicente (en adelante, señora Maldonado Vicente). Solicita la revocación de la *Sentencia* dictada el 5 de octubre de 2023 y notificada el día 10 siguiente, por el Tribunal de Primera Instancia, Sala de San Juan (en adelante, TPI). Mediante la aludida determinación judicial, se denegó la solicitud de traslado a la ciudad de Nueva York peticionada por la compareciente. En consecuencia, el TPI acogió el plan de relaciones maternofiliales propuesto en el *Informe Social Forense*.

**I.**

La presente causa se inició el 28 de julio de 2022, ocasión en que la parte demandante y apelada, Sr. José J. Velilla Sotomayor (en adelante, señor Velilla Sotomayor) instó una *Demanda de Custodia y Relaciones Filiales*.[2] En esencia, alegó que ambos litigantes ostentaban la custodia compartida de la menor O.L.V.M.

---

[1] Mediante la Orden Administrativa OATA-2024-021 de 2 de febrero de 2024, se designó al Hon. José I. Campos Pérez en sustitución de la Hon. Grace M. Grana Martínez.
[2] Apéndice, págs. 1-7.

nacida en 2011, por virtud de un acuerdo extrajudicial. Indicó que la señora Maldonado Vicente anunció que se mudaría a Nueva York a trabajar en una institución educativa. Acotó que la demandada decidió que O.L.V.M. permanecería con él hasta el verano de 2023 y que entonces se trasladaría con ella. Adujo que la señora Maldonado Vicente ha presentado inestabilidad emocional, en el empleo y en la vivienda, lo que presuntamente había causado incertidumbre en la menor. Añadió también que la menor se beneficiaba de una beca educativa hasta el duodécimo grado en Saint John's School (en adelante, SJS), sito en San Juan. A tales efectos, solicitó la custodia monoparental de O.L.V.M. y recomendó al foro primario cómo se podían llevar a cabo las relaciones maternofiliales.

El 10 de octubre de 2022, la señora Maldonado Vicente, incoó *Contestación a Demanda y Reconvención.*[3] Rechazó la imputación de inestabilidad emocional y explicó que los cambios de empleo se debieron al interés de mejorar la calidad de la familia. Apuntó, a su vez, que el señor Velilla Sotomayor había estado hospitalizado debido a un cuadro de inestabilidad emocional. Asimismo, indicó que la beca de la menor en SJS era un beneficio de su empleo, ya que la demandada laboró como docente en dicha institución educativa. Dijo desconocer si la subvención se extendería hasta que la menor cursara el nivel superior.

En su *Reconvención*, la demandada, quien es nacida y criada en Nueva York y reside en dicha ciudad desde el verano de 2022, aseveró que era su firme propósito que O.L.V.M. residiera permanentemente con ella en Estados Unidos a partir del año escolar 2023-2024, cuando la menor tendría un espacio garantizado en la institución privada Ethical Culture Field Stone School (en adelante, ECFS). Adujo que siempre se había ocupado de los

---

[3] Apéndice, págs. 8-14.

asuntos escolares de la menor, porque el señor Velilla Sotomayor olvidaba las cosas y ella debía enviarle recordatorios. Adujo que tenía un mejor empleo como maestra de escuela superior en ECFS, así como la cercanía de colaterales de la menor, abuelos y tía, por lo que solicitó la custodia monoparental y la autorización judicial para relocalizar a O.L.V.M.

El 13 de octubre de 2022, el TPI refirió el caso a la Unidad Social de Relaciones de Familia y Asuntos de Menores para su correspondiente evaluación y recomendación en torno a la relocalización de la menor.[4] El *Informe Social Forense*, suscrito por la Trabajadora Social Karen Hernández Betancourt (en adelante, TS Hernández Betancourt o funcionaria), estuvo a disposición de las partes el 5 de abril de 2023.[5] En esencia, la funcionaria recomendó que el señor Velilla Sotomayor continuara ostentando la custodia de la menor y no favoreció la relocalización de O.L.V.M., por lo que consignó las siguientes relaciones maternofiliales:

- Que en la época de Navidad (2023), la menor viaje a Nueva York para las relaciones materno filiales, durante su receso escolar. Esta fecha sería del 23 de diciembre al 2 de enero de 2024. Estas fechas serán alternas.
- Que en la época de Primavera (spring break 2024) la menor viaje a la residencia de la madre en Nueva York, durante el periodo de vacaciones de primavera. Ambos padres deberán dialogar sobre las fechas. Estas fechas serán alternas.
- Que para la época de verano (2023), la menor viaje a Nueva York una semana después de haber finalizado sus clases hasta el 15 de julio de 2023.
- Que como parte del plan de relaciones materno filiales se utilicen métodos alternos de comunicación como llamadas telefónicas y video llamadas para que la menor y la madre mantengan relación.
- Que se emita orden para que la menor sea evaluada por un/a Psicóloga y de requerir servicios que se coordinen los mismos. Que ambas partes escojan el profesional de acuerdo con el proveedor de servicios

---

[4] Apéndice, págs. 15-16.
[5] Apéndice, pág. 21. Refiérase al *Informe Social Forense* en los documentos confidenciales presentados el 5 de diciembre de 2023.

del plan médico de la menor. (Énfasis en el original suprimido).

La TS Hernández Betancourt agregó que si la demandada mostraba disponibilidad de viajar a Puerto Rico para relacionarse con O.L.V.M. lo informara al demandante con diez días de anticipación. Durante su estancia, se responsabilizaría de todo lo relacionado con la menor. Instó a que el señor Velilla Sotomayor mantuviera informada a la señora Maldonado Vicente de los asuntos educativos, médicos y emocionales de la hija en común.

En respuesta, la señora Maldonado Vicente informó al TPI acerca de la presentación de un *Home Study*, realizado por la Trabajadora Social Nidia Feliberti (en adelante, TS Feliberti); y anticipó la impugnación del *Informe Social Forense* a cargo de su perito, el Trabajador Social José Galarza Flores (en adelante, TS Galarza Flores o perito).[6]

Así las cosas, el juicio en su fondo se celebró los días 10, 16 y 25 de agosto de 2023, continuando el 5, 15, 20 y 25 de septiembre de 2023.[7] Testificaron la TS Hernández Betancourt,[8] el TS Galarza Flores,[9] la señora Maldonado Vicente,[10] el señor Velilla Sotomayor,[11] y, en cámara, el TPI entrevistó a O.L.V.M., sin grabación ni la presencia de los contendientes.[12] Por igual, la señora Maldonado Vicente ofreció y el TPI admitió evidencia documental,[13] así como prueba de refutación.[14] Por su parte, el señor Velilla Sotomayor presentó un solo *exhibit*.[15]

---

[6] Apéndice, págs. 17-20; 22-23. Además, véanse, *Home Study* e *Informe sobre Revisión Pericial Forense*, en los documentos confidenciales presentados el 5 de diciembre de 2023.

[7] Véase, Apéndice, págs. 194-209.

[8] Transcripciones de la Prueba Oral (TPO) de 10 y 16 de agosto de 2023.

[9] TPO de 16 y 25 de agosto de 2023; 5 de septiembre de 2023.

[10] TPO de 5 y 15 de septiembre de 2023.

[11] TPO de 15, 20 y 25 de septiembre de 2023.

[12] Véase, Transcripción de la Prueba Oral de 15 de septiembre de 2023, pág. 196 líneas 20-22.

[13] Refiérase a los *exhibits* unidos a la *Moción Sometiendo Prueba Documental* (Prueba Documental) de 5 de diciembre de 2023, págs. 1-398.

[14] Véanse, Prueba Documental, págs. 404-494.

[15] Véase, Prueba Documental págs. 399-402. Cabe destacar que, de las tres páginas manuscritas, sólo constan dos en el expediente, ya que la compareciente

Evaluada la evidencia ante sí, el TPI dictó la *Sentencia* apelada.[16] En ésta, determinó que el traslado de O.L.V.M. a Nueva York no redundaría en una mejor posición de la que se encontraba la menor bajo la custodia del demandante. Enfatizó que la menor fue consistente en expresar su deseo de permanecer en Puerto Rico hasta culminar el octavo grado. Por consiguiente, el TPI acogió el plan de relaciones maternofiliales propuesto por la TS Hernández Betancourt. De igual modo, ordenó al señor Velilla Sotomayor a continuar su tratamiento de salud mental; y a las partes, a coordinar una evaluación psicológica a O.L.V.M.

Inconforme, la señora Maldonado Vicente instó oportunamente el recurso apelativo del título y señaló la comisión de los siguientes errores:

**PRIMER ERROR:** Cometió error el Tribunal de Instancia al denegar las solicitudes de la apelante para la custodia monoparental de su hija y la relocalización a la ciudad de Nueva York, a pesar de que es la madre quien mejor puede satisfacer y garantizar el bienestar de la niña. Además, la relocalización de la menor representa el mejoramiento de la calidad de vida de la menor ya que, entre otras cosas, tendría más oportunidades de desarrollo, tanto emocional, como físico y educacional.

**SEGUNDO ERROR:** Aunque el foro de instancia determinó que el *Informe Social Forense* de la Unidad Social de Relaciones de Familia y de Menores no cumple con la metodología requerida por la profesión de trabajo social para el análisis de las controversias del caso ya que carece de un análisis de los asuntos de salud mental —lo que impedía conocer el estado de salud mental de las partes—, no se solicitaron los récords médicos de las partes ni las refirió a la Clínica de Diagnóstico, no empleó la literatura relacionada al traslado de menores a otra jurisdicción y no integra ni contiene un análisis comparativo de los hallazgos del *home study* con el entorno de la menor en Puerto Rico, contradictoriamente descansó en dicho informe para llegar a conclusiones contenidas en el mismo, que resultan ser altamente especulativas, contrarias a la prueba y que no redundan en el bienestar de la menor.

---

omitió el segundo folio. Refiérase a la TPO de 15 de septiembre de 2023, pág. 141 línea 18; págs. 151-154. Sobre el incidente relacionado con el documento, véase, TPO de 15 de septiembre de 2023, págs. 140-143; 156 líneas 9-18; TPO de 25 de septiembre de 2023, págs. 146 líneas 22-25; 147 líneas 1-17.
[16] Apéndice, págs. 179-193.

**TERCER ERROR:** Al emitir su dictamen, la Sala de Instancia no tomó en consideración el historial de salud mental del padre, su estado emocional actual, los riesgos de haber abandonado el tratamiento psiquiátrico, así como la medicación a partir del año 2019, los diagnósticos de depresión mayor severa recurrente con [*sic*] sicosis[17] y trastorno bipolar tipo I con episodios depresivos, el uso del cannabis por muchos años, su peligrosidad ante el hecho de que incurrió en actos de violencia doméstica contra la apelante y tampoco consideró que tiene licencia para poseer dos armas de fuego.

**CUARTO ERROR:** El foro de instancia empleó como criterio determinante para denegar las solicitudes de la apelante de custodia monoparental y relocalización en la entrevista a la menor y una aplicación mecánica o automática de los requisitos de ley ya que no contaba con un análisis y evaluación del caso que guiara su discreción.

Luego de la solicitud de prórroga concedida, el 4 de enero de 2024, la apelante presentó la Transcripción de la Prueba Oral (en adelante, TPO), la cual dimos por estipulada mediante nuestra *Resolución* de 12 de febrero de 2024. El 19 de marzo de 2024, la señora Maldonado Vicente instó el *Alegato Suplementario de la Apelante* en exceso de páginas. En el caso del señor Velilla Sotomayor, una vez concedida la prórroga oportunamente solicitada, el demandante presentó su *Alegato en Oposición de Parte Apelada* el 3 de mayo de 2024. Con el beneficio de ambas comparecencias, estamos en posición de resolver.

**II.**

**A.**

El Tribunal Supremo de Puerto Rico ha enfatizado la deferencia que los foros apelativos debemos conferir a la apreciación de la prueba testifical que realiza el juzgador o la juzgadora de hechos. *SLG Rivera-Pérez v. SLG Díaz-Doe et al.*, 207 DPR 636, 657 (2021); *McConnell Jiménez v. Palau,* 161 DPR 734, 750 (2004); *Argüello v. Argüello,* 155 DPR 62, 78-79 (2001); *López Vicil v. ITT*

---

[17] La expresión es incorrecta. Los expedientes médicos que obran en autos establecen un diagnóstico **sin** sicosis. Véanse, por ejemplo, Prueba Documental, págs. 22, 51, 55 y 127.

*Intermedia Inc.*, 142 DPR 857, 864 (1997). En ese sentido, el alto foro ha enunciado que "la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013), reiterado en *Gómez Márquez et al. v. El Oriental*, 203 DPR 783, 792 (2020). En atención a esto, como regla general, los tribunales apelativos no debemos intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el tribunal sentenciador. Tampoco ostentamos facultad para sustituir las determinaciones del foro de primera instancia por nuestras propias apreciaciones. *Gómez Márquez et al. v. El Oriental, supra,* pág. 793; *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2005).

No obstante, debe recordarse que el arbitrio del juzgador o la juzgadora de hechos, si bien es respetable, no es absoluto y una "apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora" de los foros revisores. *Dávila Nieves v. Meléndez Marín, supra*, pág. 771-772. Por tanto, podemos intervenir excepcionalmente con la apreciación de la prueba si el foro revisado incurrió en pasión, prejuicio, parcialidad o error manifiesto. *SLG Rivera-Pérez v. SLG Díaz-Doe et al., supra*, pág. 658; *Rolón v. Charlie Car Rental, Inc.*, 148 DPR 420, 433 (1999) y los casos allí citados. Se incurre, por ejemplo, en un error manifiesto cuando la apreciación de la prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble. *Gómez Márquez et al. v. El Oriental, supra*, págs. 793-794.

**B.**

El Artículo 589 del Código Civil, 31 LPRA sec. 7241, define la *patria potestad* como "el conjunto de deberes y derechos que

corresponden a los progenitores sobre la persona y los bienes de los hijos, desde que estos nacen hasta que alcanzan la mayoría de edad u obtienen su emancipación". En cuanto a la *custodia*, el ordenamiento legal lo describe como "un componente de la patria potestad, porque impone a los padres el deber primario de tener a sus hijos no emancipados bajo su compañía". *Jusino González v. Norat Santiago*, 211 DPR 855, 863 (2023); *Torres, Ex parte*, 118 DPR 469, 476 (1987). Es decir, la custodia se refiere a la tenencia o el control físico que tiene un progenitor sobre los hijos. *Id*.

El Tribunal Supremo de Puerto Rico ha afirmado que, de conformidad con las prerrogativas que derivan del poder de *parens patriae* del Estado, el tribunal ostenta amplias facultades para ejecutar las medidas que estime necesaria, al determinar la custodia de un menor. *Jusino González v. Norat Santiago*, *supra*, pág. 865. Por igual, los tribunales deben guiarse principalmente por el bienestar y los mejores intereses del menor ya que éstos constituyen la piedra angular de la política pública. *Peña v. Peña*, 164 DPR 949, 832-833 (2005); *Marrero Reyes v. García Ramírez*, 105 DPR 90, 104 (1976). A esos efectos, ante una determinación sobre custodia, los tribunales están llamados a realizar un análisis objetivo, sereno y cuidadoso de todas las circunstancias presentes en el caso ante su consideración. *Jusino González v. Norat Santiago*, *supra*, pág. 864; *Muñoz Sánchez v. Báez de Jesús*, 195 DPR 645, 651 (2016); *Ortiz v. Meléndez*, 164 DPR 16, 26-27 (2005). Al respecto, el Artículo 604 del Código Civil, 31 LPRA sec. 7283, establece los siguientes criterios a considerar en la adjudicación de custodia:

> (1) La salud mental de ambos progenitores y de los hijos;
> (2) el nivel de responsabilidad o integridad moral exhibido por cada uno de los progenitores;
> (3) si ha habido un historial de violencia doméstica entre los integrantes del núcleo familiar;

(4) la capacidad de cada progenitor para satisfacer las necesidades afectivas, económicas y morales del menor, tanto presentes como futuras;

(5) el historial de cada progenitor en la relación con sus hijos;

(6) las necesidades específicas de cada uno de los hijos menores cuya custodia se solicita;

(7) la relación del hijo con sus progenitores, sus hermanos y otros miembros de la familia;

(8) la capacidad, disponibilidad y compromiso de los progenitores de asumir la responsabilidad de criar los hijos conjuntamente;

(9) la razón o los motivos de los progenitores para solicitar la custodia compartida;

(10) si la profesión u oficio que ejercen los progenitores no es un impedimento para ejercer una custodia compartida;

(11) si la ubicación y distancia entre las residencias de los progenitores perjudica la educación del hijo;

(12) la comunicación que existe entre los progenitores y la capacidad para comunicarse mediante comunicación directa o utilizando mecanismos alternos; y

(13) cualquier otro criterio que pueda considerarse para garantizar el interés óptimo de los hijos.

Cónsono con lo anterior, la Ley Núm. 223 de 21 de noviembre de 2011, *La Ley Protectora de los Derechos de los Menores en el Proceso de Adjudicación de Custodia,* 32 LPRA sec. 3181 *et seq.,* dispone en su Artículo 7 que, al considerarse una solicitud de custodia en la que surjan controversias entre los progenitores, el tribunal referirá el caso al trabajador social de relaciones de familia, quien realizará una evaluación y rendirá un informe con recomendaciones. 32 LPRA sec. 3185. La aludida disposición legal establece criterios muy similares a los estatuidos en el precitado Artículo 604 de nuestro Código, en los casos de adjudicación de custodia de un menor.[18] Ahora, la Ley Núm. 223-2011, *supra,*

---

[18] El Artículo 7 de la Ley Núm. 223-2011, *supra,* establece los siguientes criterios:
(1) La salud mental de ambos progenitores, así como la del hijo(a) o hijos(as) cuya custodia se va a adjudicar.
(2) El nivel de responsabilidad o integridad moral exhibido por cada uno de los progenitores y si ha habido un historial de violencia doméstica entre los integrantes del núcleo familiar.
(3) La capacidad de cada progenitor para satisfacer las necesidades afectivas, económicas y morales del menor, tanto presentes como futuras.
(4) El historial de cada progenitor en la relación con sus hijos, tanto antes del divorcio, separación o disolución de la relación consensual, como después del mismo.

contempla, además, la consideración de la existencia o ausencia de la enajenación parental. Conforme con la Ley Núm. 223-2011, *supra*, "[l]a enajenación parental se refiere a la obstaculización por parte de uno de los progenitores de las relaciones filiales de sus hijos o hijas, menores de edad, con el otro progenitor, mediante el uso de diferentes estrategias, con el propósito de transformar o adoctrinar la conciencia de sus hijos o hijas, a los fines de denigrar, impedir, obstruir o destruir sus vínculos con el otro progenitor y el menor de edad presenta pensamientos o sentimientos de rechazo hacia el otro progenitor; demuestra actitudes negativas hacia este o si, en efecto, se ha afectado el vínculo afectivo entre el menor y el otro progenitor. [...]". 32 LPRA sec. 3185.

De otra parte, la Unidad Social de Relaciones de Familia y Asuntos de Menores tiene como función principal ofrecer asesoramiento social mediante evaluaciones periciales que permitan al tribunal tomar decisiones informadas en los casos ante su consideración. *Jusino González v. Norat Santiago*, *supra*, pág. 865; *Muñoz Sánchez v. Báez de Jesús*, *supra*, pág. 652. Estos funcionarios, a su vez, se rigen por un manual denominado como *Normas y Procedimientos de las Unidades Sociales de Relaciones de Familia y Asuntos de Menores*. Ello así, porque al dilucidar un

---

(5) Las necesidades específicas de cada uno de los menores cuya custodia está en controversia.
(6) La interrelación de cada menor, con sus progenitores, sus hermanos y demás miembros de la familia.
(7) Que la decisión no sea producto de la irreflexión o coacción.
(8) Si los progenitores poseen la capacidad, disponibilidad y firme propósito de asumir la responsabilidad de criar los hijos conjuntamente.
(9) Los verdaderos motivos y objetivos por los cuales los progenitores han solicitado la patria potestad y custodia compartida.
(10) Si la profesión, ocupación u oficio que realizan los progenitores impedirá que funcione el acuerdo efectivamente.
(11) Si la ubicación y distancia de ambos hogares perjudica la educación del menor.
(12) La comunicación que existe entre los progenitores y la capacidad para comunicarse mediante comunicación directa o utilizando mecanismos alternos.
(13) Analizará la presencia de la enajenación parental, o cualesquiera otras razones que pudieran ocasionar la resistencia del menor para relacionarse con sus padres. [...]
(14) Cualquier otro criterio válido o pertinente que pueda considerarse para garantizar el mejor bienestar del menor.

cambio de custodia de un menor, el foro judicial debe contar con la información más completa y variada que sea posible, de modo que pueda resolver acorde a su mejor bienestar. *Jusino González v. Norat Santiago, supra*, págs. 865-866. Cabe señalar que, en enero de 2024, la Oficina de Administración de los Tribunales promulgó una nueva edición del aludido manual que vino a sustituir la previa edición que se remonta a agosto de 2013.[19]

### C.

En lo atinente al caso del epígrafe, la Ley Núm. 102 de 15 de mayo de 2018, *Ley de la "Guía Uniforme para Casos de Relocalización del Padre Custodio"*, 32 LPRA sec. 3371 *et seq.* (en adelante, Ley 102), establece los requisitos que el tribunal deberá ponderar cuando tenga ante su consideración un asunto de esta índole. En específico, el Inciso (a) del Artículo 6 de la Ley Núm. 102-2018, 32 LPRA sec. 3376 (a), estatuye que se permitirá la relocalización del menor si se prueba que: (1) no es para impedir la relación del padre no custodio o persona interesada con el menor; (2) existe una razón válida y determinante para relocalizarse; y (3) ofrecerá una mejor oportunidad de vida tanto para el padre custodio o tutor como para el menor. Del mismo modo, el Inciso (b) de la citada disposición, enumera los factores a tomar en cuenta al determinar el mejor bienestar del menor; éstos son:

(1) Preferencia del menor en aquellos casos donde tenga derecho a ser oído;

(2) Relación del menor con el padre no custodio;

(3) Relación del menor con las personas interesadas y la forma en que éstos llevan a cabo su derecho de visita;

(4) Periodo de tiempo que el menor lleva residiendo en la residencia principal y los lazos emocionales que lo une a ella;

(5) Oportunidades de desarrollo, tanto emocional, como físico y educacional;

(6) Impacto que tendrá el traslado en su desarrollo;

---

[19] Refiérase al enlace siguiente: Normas-Procedimientos-Unidades-Sociales-Relaciones-Familia-Menores.pdf (poderjudicial.pr).

(7) Disposición del padre custodio o tutor de permitir al otro padre no custodio o persona interesada de ejercer su derecho a visita, relacionarse con el menor y custodia compartida en los casos que aplique;

(8) Potencial de cambio en la vida del padre custodio o tutor y del menor;

(9) Posibilidad económica del padre no custodio o persona interesada de ejercer su derecho a visita para relacionarse con el menor;

(10) Grado de responsabilidad del padre no custodio o persona interesada en sus obligaciones para con el menor;

(11) El tribunal podrá ordenar el realizar un estudio social del área al cual planean mudar al menor. Este estudio, entre otras cosas, deberá incluir un análisis de la criminalidad del área interesada;

(12) Lugar donde el menor va a estudiar, nombre e información completa de la escuela: dirección, teléfono, maestro del menor y nombre del director;

(13) En caso de que el menor no tenga edad suficiente para asistir a la escuela, nombre del cuido e información completa en el que estará el menor o en caso de que sea una persona particular información completa de la misma;

(14) Lugar de trabajo, nombre e información general del padre custodio o tutor legal: teléfono, dirección y nombre del patrono;

(15) Información de las personas adicionales al padre custodio o tutor legal con las que vivirá el menor, de ser el caso;

(16) Información del casero en los casos donde la residencia sea alquilada;

(17) Certificación de empleo o estudios;

(18) Se observará la recomendación del trabajador social en cuanto al efecto que esto tendrá en el menor;

(19) El seguro médico que tendrá el menor; y

(20) Cualquier otro factor que el juzgador entienda necesario, tomando como principio la equidad entre las partes. Art. 6 (b) de la Ley Núm. 102-2018, 32 LPRA sec. 3376 (b).

**III.**

En el primer señalamiento de error, la señora Maldonado Vicente imputa al TPI errar al denegar la custodia monoparental y la relocalización a Nueva York de la menor, al aducir que la apelante es quien mejor puede satisfacer el bienestar de O.L.V.M. y que el traslado representa el mejoramiento de la calidad de vida de la menor y más oportunidades de desarrollo emocional, físico y

educativo. Aduce en el tercer error señalado que el TPI no tomó en consideración el historial y estado actual de salud mental del señor Vellilla Sotomayor; ni sus diagnósticos ni los riesgos por presuntamente haber abandonado su tratamiento psiquiátrico. Añade que el TPI tampoco consideró el uso del cannabis, el haber incurrido en actos de violencia y la licencia para poseer armas que ostenta el apelado.

Por su relación, uniremos la discusión de ambos señalamientos de error. A continuación, examinamos la adjudicación impugnada, a la luz de la evidencia documental, en conjunto con los testimonios vertidos relevantes a los asuntos planteados.

La señora Maldonado Vicente, nacida y criada en Nueva York,[20] testificó que alquilaba un apartamento de dos habitaciones, un baño, sala, comedor y cocina. O.L.V.M. participó en la selección del lugar. La vivienda está muy cerca de ECFS.[21] En su testimonio, la apelante mencionó a los familiares cercanos que servirían de capital social y con quienes la menor se ha relacionado.[22]

La apelante testificó ampliamente sobre las conveniencias y ofrecimientos de ECFS; enfatizó que no era una institución religiosa, sino ética, y que la menor reconocía el privilegio de estudiar allí.[23] En cuanto a los costos educativos, indicó que anualmente ascendían a $64,000 de los cuales la beca cubriría $60,000 y ella pagaría el resto, lo que sería aproximadamente unos $4,000.[24] En contraste, mencionó que la aportación que se hace a SJS es de $111.11 mensuales más el costo de los uniformes.[25]

---

[20] TPO de 5 de septiembre de 2023, págs. 47-50.
[21] TPO de 5 de septiembre de 2023, págs. 36 líneas 19-20; 37 líneas 2-6; 38 líneas 13-18; 42 líneas 4-7.
[22] TPO de 5 de septiembre de 2023, págs. 52 líneas 1-14; 53 líneas 16-25; 54 líneas 1-3.
[23] TPO de 5 de septiembre de 2023, págs. 66-74; 72 líneas 14-18; 78 líneas 1-14.
[24] TPO de 5 de septiembre de 2023, pág. 78 líneas 15-19. Véase, Prueba Documental, págs. 379-396; 397-398.
[25] TPO de 5 de septiembre de 2023, pág. 83 líneas 14-24; TPO de 15 de septiembre de 2023, pág. 181 líneas 1-12.

La apelante testificó que, desde que se mudó a Nueva York, se mantiene al tanto de las incidencias académicas de la menor, ya que está incluida en el *chat* de padres y en la cadena de correos electrónicos.[26] No obstante, reconoció que no participó de la graduación de sexto grado de O.L.V.M. por razones económicas.[27] Cabe mencionar que, debido a que ECFS no acepta nuevos alumnos en todos los grados, la apelante admitió que estuvo dispuesta a que la menor repitiera precisamente el sexto grado para poder asegurarle la entrada a ECFS.[28]

Con respecto a su relación con la menor, desde que se mudó a Nueva York, madre e hija hablan frecuentemente, a través del móvil que le compró y hasta han establecido un horario para sus charlas.[29] Además, la apelante aporta dinero con regularidad para los gastos de la menor.[30]

Por otro lado, la señora Maldonado Vicente hizo referencia a dos incidentes separados y remotos de presunta conducta violenta contra ella y una tercera persona por parte del señor Velilla Sotomayor. Testificó que "en una discusión él me agarró por el cuello y estábamos en el baño al lado de su cuarto, me agarró por el cuello y me llevó del baño a la cama de su cuarto".[31] Contó que solicitó y se expidió una orden de protección *ex parte*, pero que no continuó con el trámite, aunque sí se terminó la relación sentimental.[32]

En otro suceso que trajo a colación, dijo que, frente a la menor, aparentemente el padre se comportó de manera violenta con una amiga de la apelante porque el carro de aquella estaba bloqueando la entrada de la casa del apelado. Dijo que luego el señor

---

[26] TPO de 5 de septiembre de 2023, págs. 96; 161 líneas 2-10.
[27] TPO de 5 de septiembre de 2023, págs. 170 líneas 11-20; 171 líneas 11-12; TPO de 15 de septiembre de 2023, pág. 25 líneas 2-11.
[28] TPO de 5 de septiembre de 2023, págs. 128 líneas 20-25; 129 líneas 1-13.
[29] TPO de 5 de septiembre de 2023, pág. 89 líneas 4-22.
[30] TPO de 15 de septiembre de 2023, págs. 180; 185; Prueba Documental, págs. 405-409.
[31] TPO de 5 de septiembre de 2023, pág. 142 líneas 16-23.
[32] Véase, *Informe Social Forense*, pág. 5.

Velilla Sotomayor se arrepintió y pagó las reparaciones del vehículo. Indicó que O.L.V.M. estaba en *shock*, calladita y con miedo.[33]

Con relación a ambas instancias, el señor Velilla Sotomayor narró sendas versiones muy distintas. Negó haber agarrado por el cuello a la apelante. Aclaró que la apelante no solicitó la orden de protección por el referido incidente, sino en una ocasión diferente, cuando él se negó a volver a retomar la relación con ella. Sobre este asunto, el apelado atestiguó que sí se celebró la vista final y que el TPI declaró *no ha lugar* la petición de la orden de protección.[34] Cabe mencionar que, en torno a este tema, la TS Hernández Betancourt expresó que no profundizó en la información aludida, precisamente porque nunca se expidió un mandamiento final.[35]

En cuanto al otro incidente, el señor Velilla Sotomayor indicó que rompió el cristal del carro de la amiga de la apelante para desactivar la emergencia, ya que el vehículo estuvo bloqueando su entrada durante horas y a su pareja le urgía salir. Dijo que la dueña de la guagua le pidió disculpas.[36]

En otros asuntos, la apelante declaró desconocer que el señor Velilla Sotomayor tuviera una licencia de armas y, por virtud de ésta, poseyera dos armas de fuego. Aludió que tampoco sabía sobre la alegada magnitud de la salud mental del apelado.[37]

Acerca de la licencia de armas, el TPI consignó que el apelado portaba armas por razones de seguridad contra la criminalidad.[38] Ello así, ya que escuchó y creyó al apelado cuando éste atestiguó sobre una trilogía de asaltos contra la propia apelante, un vecino y contra él mismo en un periodo aproximado de seis meses.[39]

---

[33] TPO de 5 de septiembre de 2023, págs. 108 líneas 19-25; 109 línea 1; 111 líneas 8-25; 112 líneas 1-5.

[34] TPO de 15 de septiembre de 2023, págs. 58 líneas 21-25; 59 líneas 1-4; 60 líneas 1-9.

[35] TPO de 10 de agosto de 2023, págs. 149 líneas 22-25; 150 líneas 1-22; 151 líneas 2-12.

[36] TPO de 15 de septiembre de 2023, págs. 90-91.

[37] TPO de 5 de septiembre de 2023, pág. 108 líneas 9-21.

[38] Apéndice, págs. 186-187, acápite 14.

[39] TPO de 15 de septiembre de 2023, págs. 97 líneas 21-25; 98 líneas 1-19.

Sobre el tema de salud mental, el TPI planteó que un diagnóstico de trastorno bipolar tipo uno no impedía que una persona estuviera apta para criar a un hijo.[40] Luego, en el caso particular del apelado, el TPI determinó probado que "[n]o surg[ía] del expediente que el Dr. Juan J. Rodríguez Vélez, quien actualmente trata al [señor Velilla Sotomayor] por depresión y ansiedad, coincida con el diagnóstico de bipolaridad que hicieron los médicos del Hospital Capestrano. El Sr. Velilla Sotomayor no toma medicamentos para la bipolaridad".[41] De hecho, consta en autos que, el 16 de mayo de 2023, el médico del apelado certificó un diagnóstico F43.23, el cual no corresponde en absoluto a algún tipo de bipolaridad, sino a un trastorno adaptativo con ansiedad y estado de ánimo depresivo. Veamos.

El señor Velilla Sotomayor declaró que, en 2019, voluntariamente decidió acudir a Capestrano:

> En el 2019 yo tuve, yo caí en una leve depresión porque me cayeron problemas encima. Uno de ellos fue que fui al dentista y me hicieron un "root canal" en el diente equivocado y cuando fui a buscar la manera de justicia para mí, me di cuenta que aquí en Puerto Rico no hay perito. Cuando fui a la Junta de Dentistas me trataron como que, las persona me dijo, "Te hago un 'root canal' el lunes y estoy en el dentista y qué vas a hacer". Y esas palabras a mí me marcaron, porque me sentí como pisoteado. Una semana después de esto, me entregaron una casa en Villa Carolina totalmente deteriorada, con cortos circuitos, sabe, vandalizada completamente y momentáneamente pues me deprimí, porque, porque es un ingreso con la casa tengo que meterle miles de dólares, me pasa lo del diente, sabe, y me deprimí realmente. Tuve una depresión, ingresé, fui yo mismo. Porque simplemente buscando un descanso, como que una, un tiempo para pensar porque...
>
> .   .   .   .   .   .   .   .   .   .
>
> Pues yo fui a San Juan Capestrano porque Lily mi pareja me dijo, "Yo te veo bien ansioso, te veo bien triste", la depresión, porque fue la casa donde yo me crié, me la entregaron en unas condiciones horribles. Pues me sentí bien triste y pues simplemente hablé y me fui para allá, y comuniqué y dije, "Mira, me está pasando esto, me hicieron un "root canal" en un diente equivocado y me entregaron la casa deteriorada, ahora

---

[40] TPO de 10 de agosto de 2023, págs. 158 líneas 23-25, 159 líneas 1-11; 161 líneas 10-13.
[41] Apéndice, pág. 187, acápite 20. Véase, Prueba Documental, págs. 414-415.

mismo me siento bien desanimado" y pues me ingresaron.[42]

Luego de un par de semanas, a la fecha del alta, le indicaron que debía comparecer a unas clínicas, a las que asistió. Le recetaron unas pastillas que dejó de tomar porque le causaban sueño y dolor de cabeza.[43] Aseveró que la señora Maldonado Vicente sabía de la hospitalización;[44] y que, durante la misma, la menor permaneció con su pareja, la Sra. Lillian Lomba Otero (en adelante, señora Lomba Otero).[45]

Al respecto, si bien del expediente médico en Capestrano se desprenden unos encasillados en que el señor Velilla Sotomayor marcó tener ideas suicidas y homicidas estructuradas con arma de fuego,[46] en formularios posteriores, dichos pensamientos ya no estaban presentes.[47] Es meritorio señalar que en el expediente que evaluamos hay ausencia total de prueba de que el apelado haya atentado contra su vida ni contra la de un tercero. Huelga decir, además, que el apelado tiene un certificado negativo de antecedentes penales y superó el escrutinio del Negociado de la Policía de Puerto Rico para ser poseedor de una licencia de armas.[48]

Valga mencionar que, con relación a la apelante, el señor Velilla Sotomayor atestiguó sobre un incidente bastante remoto en el que, estando embarazada, la señora Maldonado Vicente se automutiló el muslo.[49] Añadió que ésta tenía varias cicatrices por episodios de automutilación.[50] No obstante, indicó que la apelante también inició terapia psicológica después de esos eventos.[51]

---

[42] TPO de 15 de septiembre de 2023, págs. 85 líneas 10-25; 86 líneas 1-14. Además, TPO de 20 de septiembre de 2023, págs. 35 líneas 16-25; 36-40.
[43] TPO de 15 de septiembre de 2023, págs. 89 líneas 3-8; 89 líneas 9-18.
[44] TPO de 15 de septiembre de 2023, pág. 87 líneas 2-6.
[45] TPO de 10 de agosto de 2023, pág. 152 líneas 1-7. (TS Hernández Betancourt).
[46] Prueba Documental, pág. 104.
[47] Prueba Documental, pág. 20.
[48] Apéndice, págs. 157-178; Prueba Documental, págs. 345-375.
[49] TPO de 15 de septiembre de 2023, págs. 45 líneas 22-25; 46-47.
[50] De igual modo, en 2017, la señora Maldonado Vicente comprometió la seguridad de la menor por una relación de pareja con un individuo peligroso. Véase, TPO de 15 de septiembre de 2023, págs. 108 líneas 14-25; 109; 110 líneas 1-6.
[51] TPO de 15 de septiembre de 2023, págs. 48 líneas 24-25; 49-50 líneas 1-11.

Por otra parte, el señor Velilla Sotomayor declaró que vive en una casa propia que restauró y que siempre ha convivido con O.L.V.M.[52] Explicó que está desempleado porque recibe beneficios de la Administración del Seguro Social por su condición física, no la emocional,[53] ya que en 2002 tuvo un accidente en el que una persona ebria lo atropelló, por lo que estuvo muchos años con problemas para caminar. Como resultado, le practicaron un reemplazo de cadera. Aun cuando se encuentra mejor, todavía presenta ciertos problemas de espalda. Indicó, además, que recibe ingresos por el alquiler de apartamentos de su propiedad.[54]

El apelado explicó que, debido al intenso dolor, consumió cannabis y afirmó que ya no lo consumía. Tuvo licencia para su uso durante un año. A la fecha del juicio, declaró que llevaba más de un año sin fumar tabaco ni beber alcohol.[55] Por ello, dijo estar dispuesto a someterse a una prueba de drogas e incluso sugirió que la apelante también se sometiera al examen.[56]

De otro lado, el apelado testificó también sobre el capital social, en referencia a sus padres, hermanos y a su pareja. Aseveró que O.L.V.M. ve a la señora Lomba Otero como una segunda madre.[57] En cuanto a la menor, indicó que ambos progenitores han compartido las responsabilidades de ésta, aunque tuvo que reconocer que el proceso judicial ha afectado la comunicación entre él y la señora Maldonado Vicente.[58] Acotó que participa en las actividades escolares de la menor y trata de asistir a todo evento que anuncia la SJS.[59] Por igual, apostilló que estaba al tanto del

---

[52] TPO de 15 de septiembre de 2023, págs. 32-33.
[53] TPO de 15 de septiembre de 2023, pág. 173 líneas 3-9. La menor también recibe beneficios del Seguro Social. TPO de 15 de septiembre de 2023, pág. 176; 177 líneas 2-3.
[54] TPO de 15 de septiembre de 2023, págs. 34-36; 176; 177 líneas 2-3.
[55] TPO de 15 de septiembre de 2023, págs. 93 líneas 5-25; 94-96.
[56] TPO de 15 de septiembre de 2023, págs. 95 líneas 4-5; 97 líneas 2-9.
[57] TPO de 15 de septiembre de 2023, págs. 40 líneas 9-15; 42-44.
[58] TPO de 15 de septiembre de 2023, págs. 60-61; 67 líneas 17-21; 68.
[59] TPO de 15 de septiembre de 2023, págs. 80 líneas 17-25; 81 líneas 1-3; 81 líneas 10-16.

desempeño académico de la menor; y que la comunicación con ésta es buena, ya que la niña le cuenta sus cosas.[60] Cuando el apelado fue confrontado con que la apelante tiene que estar recordándole las cosas concernientes a la menor,[61] éste admitió que la apelante le envía recordatorios, pero que el hecho que ella los envíe no significa que él no esté haciendo las cosas.[62]

Acerca de los planes de relocalización de O.L.V.M. a Nueva York, el apelado declaró que la señora Maldonado Vicente le dijo: "Yo tengo una oportunidad de trabajo te voy a dejar a Odessa este año y luego me la voy a llevar y allá va a repetir el sexto grado". Resintió que la apelante ni siquiera le preguntara si estaba o no de acuerdo, sino que simplemente le dejó saber que ella había tomado esa decisión.[63] Indicó que, a pesar de que le encanta que la menor comparta con su familia materna, le preocupa que la apelante se mude mucho, como cuando estuvo en Puerto Rico, y quiera ir a otro estado y eso afecte la estabilidad de O.L.V.M.[64] Sin embargo, reconoció que ECFS era una gran oportunidad para la menor.[65]

En la causa presente, el TPI consignó varias determinaciones de hechos sobre las contenciones planteadas por la apelante. Hemos constatado que los enunciados fácticos del dictamen se apoyan enteramente en la prueba testifical y documental desfilada. En esencia, se reconocen las virtudes de la apelante como progenitora y las conveniencias de ECFS; se aludió al nuevo apartamento en Nueva York, descrito según las declaraciones de la apelante;[66] se mencionó a los familiares que servirían de capital social en el

---

[60] TPO de 15 de septiembre de 2023, págs. 69-71; 126 líneas 14-25; 127 líneas 1-13.
[61] TPO de 20 de septiembre de 2023, págs. 52-54. Prueba Documental, págs. 417-453. La menor también aludió a que él era distraído. Véase, *Informe Social Forense*, pág. 9, acápite 12.
[62] TPO de 20 de septiembre de 2023, págs. 78-79.
[63] TPO de 15 de septiembre de 2023, pág. 117 líneas 19-24.
[64] TPO de 15 de septiembre de 2023, págs. 134-135; TPO de 25 de septiembre de 2023, pág. 100.
[65] TPO de 25 de septiembre de 2023, pág. 99 líneas 1-4.
[66] TPO de 5 de septiembre de 2023, págs. 35-38. Véase, además, Prueba Documental, págs. 248-344.

extranjero, incluyendo a la pareja de la apelante, el Sr. Fernando Pacheco Zayas (en adelante, señor Pacheco Zayas), con quien ésta tiene planes de convivencia y ocasionalmente pernocta en su residencia.[67]

Por igual, el TPI acogió las expresiones de la apelante en torno a SJS y ECFS. A saber, que no le gustaba la filosofía de SJS, ni la educación que recibía la menor en dicha institución, pues pensaba que no se desarrollaba el pensamiento crítico, no había sentido de comunidad ni apoyo para los estudiantes.[68] En cuanto a ECFS, el TPI expresó hechos sobre los ofrecimientos académicos y extracurriculares de la institución, así como su reconocimiento por el programa de arte. Fue establecida también la información sobre el costo anual, con o sin beca. Incluso el TPI determinó que, acorde con las declaraciones de la apelante, la menor sentía entusiasmo con la idea de estudiar en ECFS porque era una gran oportunidad.[69]

De mismo modo, el TPI determinó como probado que el señor Velilla Sotomayor vive con la menor desde que ésta nació, bajo un régimen de custodia compartida extrajudicial.[70] Reseñó el incidente del accidente que afectó su salud física, las fuentes de sus ingresos, el capital social de los miembros de su familia, incluyendo a la señora Lomba Otero, quien también es su vecina.[71] Además, hizo referencia a las situaciones de salud mental que ambos progenitores han enfrentado y a la búsqueda de tratamientos.[72]

Acerca de O.L.V.M., para el TPI quedó demostrado que la menor es una excelente alumna, estudiosa y organizada. A ella,

---

[67] TPO de 5 de septiembre de 2023, págs. 52, líneas 15-25; 53 líneas 1-10; 151 líneas 14-25; 152 líneas 6-20; 156 líneas 6-20; TPO de 15 de septiembre de 2023, págs. 19-20.

[68] TPO de 15 de septiembre de 2023, págs. 10 líneas 6-24; 20 líneas 20-25; 21 líneas 1-18.

[69] TPO de 5 de septiembre de 2023, págs. 69 líneas 11-25; 70 línea 1; 77 líneas 24-25; 78 líneas 1-19; TPO de 15 de septiembre de 2023, pág. 13 líneas 3-21.

[70] TPO de 20 de septiembre de 2023, pág. 5 líneas 5-17.

[71] TPO de 15 de septiembre de 2023, págs. 34-36; 40 líneas 6-15; 42 líneas 8-23; 43 líneas 9-14.

[72] Apéndice, págs. 186 acápites 6-7, 12; 187 acápite 19-20.

según establecido en la *Sentencia*, le gustaría que "todo siguiera igual"; así como que el proceso judicial le causaba incertidumbre. El TPI estimó que la relación de la menor con ambos progenitores y sus familiares colaterales era de gran apego. Por dicha causa, a O.L.V.M. le resultaba tan difícil el pleito familiar o manifestar una preferencia por un lugar u otro.

De las declaraciones creídas por el TPI, a las cuales le otorgamos amplia deferencia, se desprende que ambos progenitores han demostrado responsabilidad y diligencia para satisfacer todas las necesidades que requiere O.L.V.M. Tanto la apelante como el apelado se mantienen prestos para atender el desempeño académico de la menor, su bienestar emocional y físico; así como cumplir con sus obligaciones maternas y paternas. Ciertamente, de los testimonios y el *Informe Social Forense* se reafirma esta apreciación. Por ello, a nuestro juicio, la señora Maldonado Vicente no logró rebatir la presunción de corrección de la decisión judicial. Cada uno de sus señalamientos fue parte de la prueba oral que vertieron las partes, por lo que el TPI tuvo la oportunidad de justipreciarlos, impartir credibilidad y otorgar el valor probatorio que, a su discreción, mereció la evidencia.

Decididamente, este caso no versa sobre la apelante *versus* el apelado, sino sobre el mejor interés de O.L.V.M. Una vez evaluado el expediente, concluimos que el TPI hizo un análisis de la totalidad de las circunstancias a la luz de los testimonios prestados, la prueba documental admitida y los criterios de la Ley 102, al determinar que no convenía la relocalización de O.L.V.M. a Nueva York, por lo que era indispensable adjudicar la custodia monoparental al señor Velilla Maldonado. No se justificaba trastocar el entorno de O.L.V.M., cuando el apelado tiene la capacidad y la disposición de velar por el bienestar de su hija en el hogar paterno, mientras la

menor continúa estudiando en SJS. Por ende, es forzoso concluir que los errores uno y tres señalados no se cometieron.

En el segundo error, la apelante sostiene que el TPI incidió al basar su decisión judicial en un *Informe Social Forense* que incumplió con la metodología requerida y presentaba varias carencias. Evaluemos las posturas periciales.

La TS Hernández Betancourt tiene un bachillerato en Psicología, una maestría en Trabajo Social y tres décadas de experiencia; la funcionaria fue calificada como perito por el TPI.[73] Del *Informe Social Forense* que suscribió, se desprende que entrevistó a ambos padres —cuatro intervenciones con la señora Maldonado Vicente y siete con el señor Velilla Sotomayor— a la menor y a la señora Lomba Otero. No entrevistó al señor Pacheco Zayas; y tampoco pudo contrastar al capital social de la familia paterna ni materna.[74] Si bien cierta información está comprendida en el *Home Study*,[75] esto no respondió a un acercamiento propio.[76] Tampoco profundizó en una comparativa de ambas instituciones educativas ni de las dos localizaciones en general.[77]

Acerca de la salud mental de los litigantes, al aplicar el octavo criterio de la Ley 102 (potencial de cambio en la vida del padre custodio o tutor y del menor), la funcionaria aseveró que el área de salud mental de los progenitores era lo más preocupante, "ya que a pesar del tiempo que hace que éstos confrontaron sus crisis, han estado sin servicios por mucho tiempo". Empero, descansó en que, al presente, ninguna de las partes expuso ninguna situación de

---

[73] TPO de 10 de agosto de 2023, págs. 28 líneas 6-14; 54 líneas 3-6.
[74] TPO de 10 de agosto de 2023, págs. 66 líneas 18-22; 68 líneas 5-9; 71 líneas 5-7, 16-20; 73 líneas 5-9.
[75] TPO de 10 de agosto de 2023, pág. 141 líneas 7-24.
[76] TPO de 10 de agosto de 2023, pág. 70 líneas 4-8.
[77] TPO de 10 de agosto de 2023, págs. 98-99. Apuntamos que el análisis de criminalidad no es comparable, toda vez que se tomó en consideración toda la ciudad de San Juan y, en Nueva York, únicamente el código postal donde reside la apelante. Refiérase al *Informe Social Forense*, pág. 23, acápite 11; *Home Study*, pág. 7.

preocupación.[78] De hecho, la TS Hernández Betancourt consideró tener la información necesaria.[79]

Nótese que, al momento del juicio, se constató que el apelado retomó la atención médica. Además, es meritorio señalar que el TPI no sólo ordenó al apelado a continuar con su tratamiento de salud mental, sino que la Sala de Familia está en potestad, de creerlo necesario, de ordenar más evaluaciones en la Clínica de Diagnóstico del Poder Judicial. En su sana discreción no lo ha hecho.

En general, a base del manual vigente y denominado como *Normas y Procedimientos de las Unidades Sociales de Relaciones de Familia y Asuntos de Menores* (edición agosto 2013), sus formularios y el ordenamiento legal, la TS Hernández Betancourt redactó el *Informe Social Forense*.[80] En éste, concluyó:

> Durante la evaluación vimos c[ó]mo ambos padres se observan en igualdad de condiciones a su crianza. No obstante, nos percatamos c[ó]mo la balanza se inclina hacia el padre, no s[ó]lo por preferencia de la menor en permanecer en Puerto Rico, sino porque no vemos razón para modificar el estilo de vida, unos hábitos que han estado funcionando. Actualmente la menor está siendo cubierta en sus necesidades académicas y emocionales. No obstante, un plan amplio con la madre sabemos que también le beneficiaría.
>
> Luego de concluida nuestra evaluación, basándose en el mejor bienestar de la menor y ponderando los hallazgos encontramos [*sic*] en la evaluación social realizada, recomendamos que sea el padre quien continúe asumiendo la custodia de la menor y no se autorice el traslado en estos momentos.[81]

De otro lado, el TS Galarza Flores, perito de la apelante, revisó el *Informe Social Forense* partiendo de tres hipótesis: si las conclusiones del documento son producto de métodos confiables; si los datos son suficientes; y si las recomendaciones son el resultado de un análisis formado en la evidencia e información corroborada.[82]

---

[78] Véase, *Informe Social Forense*, pág. 22, acápite 8.
[79] TPO de 10 de agosto de 2023, págs. 148 líneas 5-8.
[80] TPO de 10 de agosto de 2023, págs. 45 líneas 1-13; 69 líneas 3-7.
[81] *Informe Social Forense*, pág. 24.
[82] TPO de 16 de agosto de 2023, págs. 188 líneas 10-25; 189 líneas 1-8.

Concluyó en la negativa a la trilogía de premisas.[83] El perito suscribió el *Informe sobre Revisión Pericial Forense*, el cual fue admitido en evidencia.

En su evaluación, arribó a que el *Informe Social Forense* carecía de evidencia científica sin justificación para ello, no hubo indagaciones suficientes, no se entrevistó a todo el capital social ni se utilizó la Clínica de Diagnóstico del Poder Judicial, toda vez que había un componente de salud mental en ambas partes.[84] Afirmó que las conclusiones sin base científica son sesgos de la funcionaria.[85] Aunque concurrió que la menor tenía buena relación con ambos progenitores, distinguió la recopilación de información de las necesidades cognitivas, educativas y emocionales del análisis de dicha información.[86] Por igual, opinó que la TS Feliberti tampoco hizo acopio suficiente de información.[87]

Según el TS Galarza Flores, en los casos en que existen condiciones de salud mental, debe observarse la aplicación de los ocho factores de Allan Foster[88] sobre los criterios del ordenamiento jurídico.[89] Para el experto, pues, el *Informe Social Forense* estaba inconcluso, por lo que no asesoraba bien al juzgador.[90]

Al respecto, el TPI enunció lo siguiente:

> En el caso de autos, entendemos que el [*I*]nforme [*S*]ocial de la T.S. Hernández Betancourt no cumplió con la metodología requerida por la profesión de trabajo social para el análisis de la controversia que hoy nos ocupa. Como bien declaró el perito de la parte demandada, el Sr. Galarza Flores, el *Informe Social* de la Sra. Hernández Betancourt carece del análisis de literatura

---

[83] *Informe sobre Revisión Pericial Forense*, págs. 48-49.
[84] TPO de 16 de agosto de 2023, págs. 207 líneas 19-24; 208 líneas 4-21; 211 líneas 4-9; 222 líneas 1-12; 230 líneas 11-20; 233 líneas 10-20; 238 línea 11; TPO de 25 de agosto de 2023, pág. 122 líneas 8-11.
[85] TPO de 25 de agosto de 2023, págs. 70 líneas 5-18; 88 líneas 5-19.
[86] TPO de 25 de agosto de 2023, págs. 94 líneas 3-5; 128 líneas 23-25; 129 líneas 1-11.
[87] TPO de 5 de septiembre de 2023, pág. 12 líneas 3-6.
[88] Foster propone ocho categorías amplias de atributos de crianza, cualquiera de los cuales puede verse afectado negativamente por alguna psicopatología. Éstas son: (1) vínculo afectivo y apego, (2) abnegación, (3) percepción y acción, (4) comunicación, (5) modelado de roles, (6) paternidad autoritaria, (7) inclusión y (8) cooperación. Véase, *Informe sobre Revisión Pericial Forense*, pág. 29.
[89] TPO de 5 de septiembre de 2023, pág. 30 líneas 3-10.
[90] TPO de 25 de agosto de 2023, pág. 91 líneas 8-17.

relacionado a asuntos de salud mental y el traslado de menores de una a otra jurisdicción, elementos centrales para el análisis de los hallazgos de este caso.

El [I]nforme [S]ocial [F]orense no integra, ni contiene, un análisis comparativo de los hallazgos del [H]ome [S]tudy con el entorno de la menor aquí en Puerto Rico. En cuanto al aspecto de la salud mental, a pesar de ser el factor de mayor preocupación para la Sra. Hernández Betancourt, según surge del propio [I]nforme, no se solicitaron récords médicos, ni se refirió a las partes a la Clínica de Diagnostico del Tribunal. Ello conlleva que se desconozca en este momento, salvo por lo informado por las propias partes, el estatus de sus condiciones de salud mental.

En este caso, si bien reconocemos ciertas deficiencias en el *Informe Social Forense*, estimamos que el TPI adoptó una determinación basada en información correcta e incontrovertida, según consta en el documento. El *Informe Social Forense* procuró aplicar los conceptos tradicionales de la práctica especializada del trabajo social forense, así como los procedimientos judiciales. De una manera sencilla y útil, interpretó la información recopilada para proveer una evaluación objetiva, a través de un examen integral del componente familiar. Entendiendo que las situaciones en que se habían visto comprometidas las condiciones emocionales de ambos progenitores eran remotas y no se habían vuelto a presentar, la TS Hernández Betancourt se concentró en otras áreas más relevantes para brindar su recomendación.

A base de la totalidad de las circunstancias surgidas de las observaciones y entrevistas, unido a los criterios de la Ley 102, la TS Hernández Betancourt recomendó que, en el mejor interés de la menor, ésta debía permanecer en Puerto Rico con el apelado. Para arribar a esta conclusión, la funcionaria abundó en cada uno de los aspectos que contempla el estatuto y que son relevantes a la situación familiar.[91] Por ejemplo, el apego de O.L.V.M. con su papá y con su mamá; el hecho que la niña ya llevaba desde mediados de

---

[91] Véase, *Informe Social Forense,* págs. 20-24.

2022 residiendo bajo la custodia del padre; la disposición de ambos progenitores a dar continuidad a las relaciones filiales; que a pesar de la distancia, madre e hija mantienen una relación constante; y la firme preferencia de la menor de permanecer en Puerto Rico. Así, pues, recomendó que el apelado continuara ostentando la custodia de O.L.V.M., porque no encontró razón para modificar el estilo de vida de la menor, el cual se había demostrado que estaba funcionando.

Adviértase, no obstante, que las determinaciones de custodia no constituyen propiamente cosa juzgada, debido a que están sujetas a revisión judicial si ocurre un cambio en las circunstancias, siempre que se considere el mejor interés y bienestar del menor. *Jusino González v. Norat Santiago, supra,* pág. 866; *Figueroa v. Del Rosario,* 147 DPR 121, 128 (1998). Consiguientemente, **las adjudicaciones de custodia no son estrictamente finales ni definitivas, ya que pueden surgir hechos y circunstancias posteriores al dictamen que requieran que se modifique**. *Id.*; *Figueroa v. Del Rosario, supra,* pág. 129. A la luz de lo anterior, en el ejercicio del poder de *parens patriae* y la discreción judicial, **nada impide que, en un futuro, se autorice la relocalización, en el caso que resulte en el mejor interés de O.L.V.M. y que ésta continúe favoreciendo cursar la escuela superior en Nueva York**.[92]

Finalmente, en el cuarto y último señalamiento de error, la apelante plantea que el TPI erró al denegar las solicitudes de custodia monoparental y relocalización a base del criterio determinante de la entrevista a O.L.V.M., así como una alegada aplicación mecánica de los requisitos de la Ley 102.

---

[92] De darse el caso, sería a base del manual *Normas y Procedimientos de las Unidades Sociales de Relaciones* (edición enero 2024).

En este caso, el TPI tuvo la oportunidad de entrevistar en cámara a la menor el 15 de septiembre de 2023. En ese momento, O.L.V.M. ya había cumplido 12 años. Producto de la conversación, el TPI esbozó las siguientes aseveraciones:

1. Comparte y se siente igual de cómoda con ambas familias, la de su mamá y la de su papá.

2. Aunque indica que le da "igual" mudarse a Nueva York y reconoce que ECFS podría brindarle más oportunidades educativas, entiende que aún no está segura si se visualiza allí.

3. Le gusta el vecindario donde vive su mamá. Aunque aún no lo conoce mucho, lo que vio le gustó bastante.

4. Del traslado a Nueva York le preocupa perder a sus amigas y entrar a la nueva escuela ya comenzado el semestre.

5. Antes de mudarse, le gustaría conocer más el vecindario donde se mudó la Sra. Maldonado Vicente. No sabe cómo son los vecinos.

El TPI indicó que la menor mostró aprehensión ante la posibilidad de trasladarse a Nueva York a vivir. Le preocupaba que sus padres se sintieran tristes con la decisión del tribunal. El TPI apreció también que la jovencita se sentía presionada por el proceso judicial y que esto la llevaba a desarrollar un conflicto de lealtades para con sus progenitores.

En su análisis, el TPI aplicó varios de los criterios contemplados en la Ley 102. Sobre la relación de la menor con sus padres, se reiteró que O.L.V.M. tenía un gran apego con ambos. Se consignó el hecho que la menor sólo había vivido en Puerto Rico, donde, por más de diez años, sus progenitores habían ostentado una custodia compartida acordada entre ellos, sin la intervención de foros judiciales. Claro está, actualmente, es físicamente imposible continuar con el arreglo de custodia compartida. Además, el TPI aludió a la idoneidad de ambas viviendas; así como a las oportunidades de desarrollo de la menor, tanto en SJS como en ECFS. El TPI resaltó la demostración de que ambas partes estaban en la mejor disposición de satisfacer las necesidades de O.L.V.M.

para que continúe relacionándose con la persona no custodia y las posibilidades económicas del señor Velilla Sotomayor y de la señora Maldonado Vicente para sufragar los gastos de viajes y estadías, inherentes a la actual situación familiar. Por último, el TPI se refirió al alto grado de responsabilidad de ambos progenitores para cumplir con sus obligaciones parentales.

Ahora bien, el TPI también auscultó la preferencia de O.L.V.M. Ello así de conformidad con la Ley 102, la cual establece palmariamente entre los criterios a considerar en los casos de relocalización la preferencia del menor con derecho a ser oído. Al respecto, el TPI enunció que la menor fue consistente en sus entrevistas al expresar su deseo de permanecer en Puerto Rico hasta culminar su octavo grado. Cónsono con lo anterior, la TS Hernández Betancourt testificó acerca de la seguridad demostrada por la menor en las dos entrevistas sobre su deseo de quedarse en Puerto Rico; una decisión clara y objetiva.[93] En torno a este asunto, el TS Galarza Flores opinó que "[l]as referencias de [O.L.V.M.] se vieron reflejadas (aunque no analizadas a profundidad) en el *Informe Social Forense*, y es algo que, en el proceso de toma de decisiones, sus opiniones y preferencias deben ser escuchadas y tomadas en serio".[94]

En suma, colegimos que la alegación de que la preferencia de la menor fue el factor determinante para la decisión del TPI es meramente una impresión de la apelante que no se sostiene en el dictamen impugnado ni en el expediente. Según lo esbozado antes, el TPI consideró los criterios establecidos en la Ley 102 y ninguna de sus observaciones logró ser revertida por la apelante. Además, contrario a lo planteado, estamos convencidos que la menor tiene derecho a ser oída por lo que el referido criterio, unido a las otras

---

[93] TPO de 16 de agosto de 2023, págs. 118 líneas 1-7; 120 líneas 18-22. Además, *Informe Social Forense*, pág. 9.
[94] Véase, *Informe sobre Revisión Pericial Forense*, pág. 35.

áreas señaladas en la *Sentencia,* justifican la determinación de adjudicar la custodia monoparental a favor del señor Velilla Sotomayor, según la ha ostentado desde 2022, cuando la señora Maldonado Vicente se mudó a Nueva York. Nótese que, al presente, O.L.V.M. ha cumplido 13 años, por lo que los progenitores deben asumir que lo que tiene que decir su hija adolescente es importante en la toma de decisiones que inciden sobre su vida. Asimismo, tanto la apelante como el apelado deben comprender que ostentan la patria potestad de la menor por lo que, en cuanto a las decisiones de envergadura y concernientes a la jovencita, están impedidos de actuar unilateralmente. Del mismo modo, están compelidos a evitar cualquier vestigio de enajenación parental[95] y restaurar la comunicación. Por lo dicho, es nuestro criterio que el aducido error no se cometió.

**IV.**

Por los fundamentos expuestos, los cuales hacemos formar parte integral del presente dictamen, se confirma la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.  El Juez Pérez Ocasio *concurre* con la determinación de la mayoría y hace la siguiente expresión:  Entendemos necesario que el foro de instancia debe ordenar a la Unidad Social de Relaciones de Familia y Menores realizar un *Informe Social Forense* **actualizado** que pueda poner en posición al foro apelado de **modificar o ratificar** su determinación del 5 de octubre de 2023.  Podemos observar que el *Informe Social Forense* fue presentado el 5 de abril de 2023, o sea, hace aproximadamente dos (2) años, por lo que las circunstancias en este momento pueden

---

[95] Al momento, la TS no evidenció manifestaciones de enajenación parental; véase, *Informe Social Forense,* pág. 18.

haber cambiado para beneficio de todas las partes, principalmente

para la menor O.L.V.M.



Lcda. Lilia M. Oquendo Solís<br>
Secretaria del Tribunal de Apelaciones